**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LABORERS' DISTRICT COUNCIL AND CONTRACTORS' PENSION FUND OF OHIO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JAMES HARDIE INDUSTRIES PLC., AARON ERTER, and RACHEL WILSON,<br><br>Defendants. | Case No. 1:25-cv-13018<br><br>Hon. LaShonda A. Hunt<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT** .................... 1

**II. JURISDICTION AND VENUE** .................... 9

**III. PARTIES** .................... 10

**IV. FORMER JAMES HARDIE EMPLOYEES** .................... 12

**V. FACTUAL ALLEGATIONS** .................... 20

A. Overview of James Hardie's North America Fiber Cement Business .................... 20

B. After a Destocking Incident in 2022, Erter and Wilson Assured Investors They Would Effectively Manage Channel Inventory Levels on Behalf of Distributors and Dealers .................... 21

C. Defendants Overloaded James Hardie's Distributors and Dealers with Excess Inventory to Artificially Boost Sales and Knew About Customer "Destocking" by April 2025 .................... 25

D. Defendants Concealed The Inventory Destocking Issues To Avoid Further Investor Backlash After Investors Reacted Negatively To The AZEK Acquisition .................... 27

E. James Hardie's Overstuffed Channel Becomes Too Big to Hide and James Hardie is Forced to Reveal the Truth .................... 29

F. Post Class Period Developments .................... 31

**VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS** .................... 32

A. May 20, 2025 Earnings Call and Form 20-F .................... 33

B. May 21, 2025 Earnings Release .................... 44

**VII. THE TRUTH EMERGES** .................... 46

**VIII. POST-CLASS PERIOD DEVELOPMENTS** .................... 47

**IX. ADDITIONAL SCIENTER ALLEGATIONS** .................... 49

A. Erter and Wilson Had Massive Financial Incentives to Inflate North America Performance .................... 50

B. James Hardie Closely Monitored Channel Inventory Levels and Erter Admitted They Started to See Destocking in April 2025 .................... 51

C. Both Jason Miele and Defendant Wilson "Stepped Down" From Their Positions as CFO After Disclosing Channel Destocking Issues .................... 54

D. James Hardie's North America Channel Was Too Big to Ignore .................... 54

**X. LOSS CAUSATION/ECONOMIC LOSS** .................... 57

**XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE** .................... 59

**XII. NO SAFE HARBOR** .................... 60

**XIII. CLASS ACTION ALLEGATIONS** .......................................................................... 61

By and through its undersigned counsel, Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff") alleges the following against James Hardie Industries plc ("James Hardie" or the "Company"), Aaron Erter ("Erter"), and Rachel Wilson ("Wilson") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by James Hardie with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; (e) information readily obtainable on the Internet; and (f) interviews of former James Hardie employees ("FEs"). Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities (the "Class") who purchased, or otherwise acquired, James Hardie common stock (previously American Depositary Shares until their conversion to common stock on July 1, 2025) during the period from May 20, 2025 through August 19, 2025, inclusive (the "Class Period"), including AZEK, Inc. ("AZEK") shareholders who acquired James Hardie common stock when James Hardie acquired AZEK, Inc. on or around July 1, 2025, seeking to pursue remedies for Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2. This case concerns Defendants misleading investors about James Hardie's inventory channel in May 2025, denying that customers were destocking inventory when, at the time, Erter admitted James Hardie was seeing inventory destocking by its customers. This false denial came after a similar incident in 2022 when James Hardie previously denied inventory destocking by customers but pledged to ensure there would not be a repeat.

3. James Hardie is the world's largest manufacturer of fiber cement building products. It sells primarily to distributors and dealers, who then sell those products to end-users such as homeowners, architects, builders, and contractors. Because the inventory channel from its dealers and distributors to end-users is crucial to maintaining its business, James Hardie essentially manages all aspects of its sales channel. The Company virtually manages distributor inventory under certain agreements and also employs a dedicated sales team for end-user demand.

4. Because James Hardie does not disclose its channel inventory levels, investors rely on Defendants' representations to determine the strength of its sales and demand. At the start of the Class Period, Defendants painted a picture of North America growth that "exceed[ed] expectations" in organic revenue and Earnings Before Interest and Taxes ("EBIT") margin for fiscal 2023 through 2025. Unbeknownst to investors, however, James Hardie was trapped in a cycle of overstuffing distributors with inventory at the end of each quarterly period to meet sales expectations. To do this, James Hardie's sales team would offer special discounts to distributors and dealers only at the end of the quarter, in response to intense pressure from Defendant Erter to increase sales to meet quarterly financial results. Only by pulling sales forward from future quarters was James Hardie able to "exceed" earnings expectations.

5. Erter's compensation heavily depended on the North America segment, with 87% of his total compensation stemming from performance-based "at risk" compensation, providing him with strong incentive to pressure James Hardie employees to pull-forward sales and meet or exceed expectations. James Hardie had a "Circuit breaker on annual STI awards ***to ensure that no annual incentive awards are paid unless minimum North America growth and corporate performance levels are achieved***." Defendants' practice of pulling sales forward from future quarters to ensure that James Hardie met or exceeded then current financial expectations, made sure the North America segment met those growth targets for fiscal years 2023 through 2025.

6. By selling excess inventory into the channel at the end of a quarter, Defendants essentially stole sales from future periods and forced the Company to repeatedly make the same decision each quarter: either continue the practice of cannibalizing sales from future quarters or "bite the bullet" and endure a bad quarter or year to end the practice of robbing sales from future quarters to make the current quarter look good. Defendants, however, chose to maintain the practice of pulling future sales into a then-current quarter, resulting in massively elevated channel inventory levels during the Class Period. Defendants knew, or recklessly disregarded, that those elevated levels of channel inventory were unsustainable and would eventually need to normalize, causing the Company to experience a marked reduction in sales that would negatively and materially impact its revenues, guidance, and financial outlook.

7. To avoid revealing this truth to investors, Defendants hoped to hide behind its planned acquisition of AZEK and its North America Exteriors business to boost the North America segment and mask James Hardie's overloaded sales channel. AZEK's exteriors would represent a completely new area of business, namely "outdoor living" materials such as decking and other accessories. James Hardie announced on March 24, 2025 that it would acquire AZEK for total

consideration of $8.75 billion, with AZEK shareholders receiving $26.45 in cash and 1.034 shares of James Hardie common stock. The acquisition closed on July 1, 2025.

8. At the time it was announced, the deal received backlash from shareholders who questioned why James Hardie would undergo such a drastic strategic pivot, from what appeared to be its stable and profitable fiber cement business, to the more volatile outdoor living category. James Hardie's North America Fiber Cement segment was its most profitable, making up about 80% of the Company's revenue and holding approximately 90% market share. To investors, the segment appeared to be a reliable source of revenue, but they did not have the full picture regarding just how James Hardie was able to meet or exceed financial results. Indeed, demonstrating investors' unhappiness with the deal, James Hardie's stock price fell by almost 19% after announcing the acquisition on Monday March 24, 2025, with its stock price falling from its closing price of $29.28 on March 21, 2025 to $24.25 on March 24 and $23.80 on March 25, 2025.

9. Defendants promoted the acquisition as expanding James Hardie's reach and expecting to significantly elevate its brand recognition and marketing in North America. Indeed, Defendant Erter touted their ability to expand AZEK's presence and stated on May 20, 2025 that the combination with AZEK was expected to "further accelerate our sales growth" and "[o]ur combined business will be an engine of tremendous cash flow generation."

10. At the same time, Defendants knew James Hardie's sales channel was a hot topic among analysts and investors, as Defendants were frequently and directly asked to comment on their channel inventory levels, including whether James Hardie was experiencing elevated inventory levels. Analysts wanted to know about the channel to assess whether the Company's results could be impacted by the pulling in of future sales into the channel and, if so, to what extent such sales would impact future revenues.

11. Analysts remembered a severe incident of distributors and dealers "destocking[1]" to reduce channel inventory from November 2022 through early 2023. On November 7, 2022, Defendant Erter disclosed that customers were asking to lower inventory levels and that there would be "a significant reduction to our August-September projections" for North America. Keith Chau, an analyst with MST Marquee, then asked if the "dealer distributor channel" had an "element of destocking" that would impact volumes. Erter responded, "They signaled to us in the quarter, their desire to lower stocking levels late within the quarter." In response to this news, James Hardie's ADS price fell over 16%, declining from its closing price of $21.35 on November 7, 2022 to $19.14 on November 8 and $17.93 on November 9, 2022.

12. In the next earnings call, on February 13, 2023, James Hardie's prior CFO at the time, Jason Miele, described "significant channel destocking." In response, numerous analysts asked follow-up questions, including Lee Power from UBS, asking, "Can you just talk a little bit about inventory levels in the channel, like where do you think they sit now? And particularly, just thoughts around risk of further destocking given your kind of your outlook commentary?" In response, Erter stated, "[i]t really does vary customer by customer" and "some customers [are] still trying to get their inventory levels lower with the lower demand out there."

13. Only a few months later, in August 2023, Jason Miele "stepped down" as CFO and was succeeded by Defendant Wilson. On Wilson's first earnings call as CFO on November 7, 2023, she assured investors that "on the inventory, ***we're doing a lot more with customer integration"*** which involves integrating sources that store customer and inventory, and stated "we're specifically ***getting a tighter look on their inventory with our top customers***, largely driven

[1] Inventory "destocking" is generally understood to be a deliberate business strategy to reduce inventory levels, including finished goods and raw materials, to free up cash, decrease storage costs, or manage excess inventory. Often occurring after a period of overstocking or when consumer demand drops, it involves slowing down production, pausing new orders, or clearing stock through discounts.

the North America" to "***efficiently manage their inventory and our inventory***." Erter reiterated the new protections with "customer integration" and "the data in which they're giving us, which is helping us as it relates to helping them, right, ***to have the right inventory and where they need it***…Just to give you a stat, we've taken our largest customers, ***we had about 30% of them that gave us data. Now we're closer to 70% this year***." Even though the issue appeared solved, analysts did not forget and routinely asked about channel levels in almost every subsequent earnings call.

14. James Hardie uses "vendor managed inventory agreements" whereby James Hardie takes responsibility for monitoring and replenishing their dealers' and distributors' inventory levels using real-time data sharing. This would ideally reduce both shortages and surpluses of inventory. FE 3, who is identified in more detail below, described this process as "virtually managed inventory" whereby James Hardie controls the inventory the distributors have for each stock keeping unit (SKU), which refers to the unique code assigned to a specific product variant to track inventory internally. SKUs are used in manufacturing to monitor inventory levels, streamline the picking process, and automate reorder points, reducing stock-outs and errors. They can also track production, batch numbers, and warehouse locations with precision.

15. In addition to managing distributors' inventory levels for them, including deciding when to replenish those inventories, James Hardie also did not have to transfer possession of the inventory in order to recognize revenue. Thus, James Hardie's sales were not constrained by the physical space allocated by its distributors and dealers. This ability to recognize revenue without actually delivering products made it easier for Defendants to sell excess inventory without distributors or dealers noticing a surplus.

16. While Defendants used their role in managing channel inventory to oversell in excess of demand, they denied that elevated channel inventory was a concern. On James Hardie's

May 20, 2025 earnings call, Keith Chau, the same MST analyst that asked questions about the channel over two years earlier, asked Erter, "how you're thinking about channel inventory levels and ***whether there is risk of destocking just going back to the experience in 2022***." In response, Erter falsely stated, "I would say that ***we are seeing normal stock levels out there*** just as a general statement." In reality, Erter would admit just three months later, in August, that he had seen the exact destocking issues being asked about in "***April through May***."

17. Erter also assured investors on the May 20, 2025 earnings call that the market environment and demand would be no concern, even though decreased demand would have the impact of revealing their overinflated inventory channel. On the same May 20 earnings call, Erter assured investors that despite a "more challenging market environment," James Hardie was well-positioned to "sustain" its current "outperformance in our markets." Erter also clarified that "[o]ur team is poised to execute on FY '26." These statements were likewise false and misleading in light of the "destocking" Defendants admittedly saw by at least April 2025.

18. Coming on the heels of investors unhappiness with the AZEK acquisition announced on March 24, Erter was motivated to conceal even more bad news to investors about overstocked inventory, so he misrepresented that James Hardie was "seeing normal stock levels out there" to avoid further investor backlash and stock price decline, which could have impacted whether the AZEK deal would go forward.

19. Without the artificial boost from selling beyond demand and increasing its North America channel inventory to unsustainable levels, James Hardie's reported financial results would have been materially different, as evidenced by the negative impact to the Company's financial results and prospects disclosed at the end of the Class Period. Further, James Hardie's Class Period financial statements failed to disclose the impact of increased North America channel

inventory on the Company's reported and future financial results, rendering James Hardie's financial statements materially false and misleading.

20. James Hardie's massively elevated channel inventory obfuscated declining end-user demand. Faced with excess inventory and declining demand, Defendants knew, or recklessly disregarded, that any correction in channel inventory levels would be exacerbated by the inability of James Hardie and its distributors and dealers to sell inventory, which would further harm the Company's financial condition.

21. The truth behind Defendants' misrepresentations and omissions was revealed to investors on August 19, 2025. After the close of trading on August 19, 2025 James Hardie shocked investors by disclosing that net sales in North America Fiber Cement declined by 12% due to the customer destocking first discovered by Defendants "in April through May." Defendant Erter explained that the results reflect a "normalization of channel inventories" that was expected to impact sales for at least the next two quarters. In other words, Defendants' practice of stealing sales from future quarterly periods had finally overloaded James Hardie's distributors and dealers.

22. On this news, the price of James Hardie's common stock dropped by over 34%, or $9.79 per share, from a closing price of $28.43 per share on August 19, 2025 to $18.64 per share on August 20, 2025. This was the Company's largest one-day drop since 1973.

23. Wall Street analysts expressed surprise and reacted negatively to the news. A report by Truist Securities on August 20, 2025, titled "Dramatic Miss on Results Raises More Than Just Weak Homebuilder Market Questions on Share" commented on "shockingly low FY26 guide despite now including Azek." William Blair noted on the same date that "channel de-stocking" was a "big negative surprise[]." It further stated "This quarter's big miss and guide reset is hard to defend. We feel confident new guidance will prove conservative, particularly on the destock

assumption." A report published by Macquarie, also on August 20, called James Hardie "clear as mud" and stated its FY26 guidance "disappoints."

24. The next day, on August 21, CLSA published a report titled "Rude awakening" and stated "JHX's revelations of customer destocking, particularly in the US Southern region, is concerning in our view." In addition, "the magnitude of JHX's miss raises some questions over management's visibility and internal systems, in our view."

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

26. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

27. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

28. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company has its U.S. corporate headquarters located in this District and conducts substantial business here.

29. In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

30. Lead Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased James Hardie common stock during the Class Period and has been damaged thereby. *See* ECF No. 38-1.

31. Defendant James Hardie Industries plc. provides exterior home and outdoor living solutions, including fiber cement, fiber gypsum, and composite and PVC decking and railing products. It markets itself as the number one producer of high-performance fiber cement building solutions in the United States. The Company's United States headquarters is in Chicago, Illinois and its common stock trades on the NYSE under the ticker symbol "JHX." The Company is incorporated in Ireland. As of about July 1, 2025, James Hardie's ADSs, which were also previously listed on the NYSE under the ticker symbol "JHX," were terminated and replaced with ordinary shares, at a ratio of one for one. James Hardie is classified as a foreign private issuer and files annual results with the SEC on Form 20-Fs and quarterly results on Form 6-Ks in accordance with U.S. GAAP. James Hardie operates with its fiscal year ending on March 31.

32. Defendant Aaron Erter ("Erter") was appointed Chief Executive Officer ("CEO") of James Hardie in September 2022 and also serves as Executive Director of the Board of Directors. Erter represents that he has 25 years of experience in the consumer and industrial sectors, with extensive expertise in strategy development, marketing, sales, and mergers and acquisitions. Before joining James Hardie, he served as CEO of PLZ Corp., Global President of the Consumer and Industrial businesses at Sherwin-Williams, and Senior Vice President and General Manager of North America Consumer Products at Valspar. He also held various

leadership positions for 15 years at Stanley Black & Decker, where he managed sales and marketing for certain brands. As CEO of James Hardie, Erter was the senior-most officer of the Company, with ultimate responsibility for James Hardie's performance and operations and for communicating with the Board. Erter also had approval over and was a signatory to James Hardie's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market related events.

33. Defendant Rachel Wilson ("Wilson") served as Chief Financial Officer ("CFO") of James Hardie from August 16, 2023 to November 17, 2025. On November 17, 2025, the Company announced that Wilson would "step[] down" from her role as CFO but would remain with the Company in an advisory role until March 31, 2026. Prior to her appointment as James Hardie's CFO, Wilson served as Executive Vice President, Chief Financial Officer and Treasurer at R1 RCM, and held leadership positions at Iron Mountain, Jarden Corporation and Avon Products. Before that, Wilson served in corporate finance and M&A investment banking roles at Citigroup and Morgan Stanley. As James Hardie's CFO, Wilson was the Company's senior-most financial officer. Wilson also signed James Hardie's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

34. Collectively, Defendants Erter and Wilson are referred to throughout this complaint as the "Individual Defendants."

35. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

36. James Hardie and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV. FORMER JAMES HARDIE EMPLOYEES

37. **Former Employee 1 ("FE 1"):** FE 1 served as the Global Head of Business Intelligence & Insight at James Hardie from March 2023 through November 2025. Through FE 1's position, FE 1 was a member of James Hardie's North America Leadership Team and Global Senior Leadership Team, and FE 1 provided consumer insight and business analytics to support the North American Leadership Team. FE 1 reported to the President of the North America segment Sean Gadd. After the AZEK acquisition closed, FE 1 reported to Chris Russell, who came from AZEK and was the head of investor relations and strategy.

38. FE 1 explained that James Hardie knew about potential future sales because the Company closely monitored developments both with their own customers and broader building

trends and tracked information in various ways, including tracking land deals. Vendor Managed Inventory (VMI) was referenced in meetings FE 1 attended with the sales and supply chain teams. FE 1 explained that the supply chain team kept an eye on inventory levels, and the sales team would try to drive sales when a distributor's inventory had been depleted. FE 1 stated the sales team was always looking for distributors who were willing to take more inventory, especially during the "frantic" times at the end of quarters and at the end of each year. Also, James Hardie personnel were in constant contact with large builders, including asking which contracts they had won. James Hardie subscribed to data from Dodge Construction, which gave them additional insight.

39. According to FE 1, James Hardie would generally know when a residential project would be "breaking ground," and the number of units, at least six to nine months in advance. That time could be even longer for commercial developments because of the types of permits that might be required from the various municipalities. Because siding is one of the last parts of a building put up in construction, there is an especially long lead time for James Hardie's products, though it was more difficult to predict sales for smaller contractors.

40. Every quarter, Erter placed a lot of "pressure" on employees on the North American team to meet sales and earnings goals, especially the head of the team, who FE 1 reported to. This pressure resulted in "concerted efforts" to make each quarter's goal by pulling in sales from the following quarter. FE 1 said the pressure came ahead of earnings calls because Erter wanted the Company to look good. As a result of this pressure, throughout FE 1's employment at James Hardie, as each quarter closed there was a "mad rush" to pull sales forward from the ensuing quarter. FE 1 explained that this meant sales which should have occurred in the following quarter,

were pulled forward into the then-current quarter to meet sales goals with the sales team offering discounts to distributors, lumber yards, and large builders, to pull those sales forward.

41. FE 1 also stated that "very heavy" discounting was offered to distributors in the first quarter of each fiscal year, which started in April, to get them to take more inventory and get the first quarter back "on track" from the sales that had been pulled into the prior quarter. Some of the large distributors who were offered heavy discounts included 84 Lumber, ABC Supply, Builders FirstSource, Beacon Building Products (which is now known as QXO), US LMB, and Boise Cascade.

42. FE 1 was copied on emails that were sent to the North American leadership team in which employees discussed pulling sales forward to meet financial goals because Erter was preparing for upcoming earnings calls. FE 1 believes these emails were sent around May or June 2023, which was near the end of FE 1's first full quarter at the company. FE 1 stated that Sean Patel (James Hardie's Senior Director of Commercial Operations), John Madson (James Hardie's Chief Sales Officer), and Chad Fredericksen (VP of North American Professional Channel) also received these emails. The first email in the chain was typically from Sean Gadd, the President of the North America segment, explaining that Erter wanted the Company to meet their targets. Other times, the email was sent directly from Erter, which Gadd forwarded to the rest of the North American leadership team. These emails directed offering heavy discounts to pull sales forward to meet the upcoming quarters' sales goals. The personnel copied on the emails were aware of the pressure from Erter and the practice of pulling in sales.

43. As FE 1 learned more about James Hardie's practice of pulling in sales from ensuing quarters to meet goals in quarters that were about to close, FE 1 started to feel uncomfortable and asked to be removed from these emails around February or March of 2024

because FE 1 felt the Company was not doing the right thing by depleting future quarters to meet goals. However, FE 1 knew that emails regarding pressure from Erter and pulling in sales continued to be sent throughout FE 1's employment at James Hardie because other employees showed them to FE 1.

44. Prior to being taken off the emails, FE 1 also recalled that specific customers were discussed in the emails, especially in Texas, where sales had been dropping off because of the economy. FE 1 said efforts were made to "close the gap" between actual sales and sales goals by offering bigger discounts to pull in sales. FE 1 explained that sometimes a big builder like D.R. Horton was not ready to buy products in a certain quarter, so James Hardie offered discounts with a time limit to increase sales by the end of the quarter, even though the builder might be five to six months away from truly being ready to order.

45. FE 1 regularly attended various meetings with the North American leadership team, including meetings that were held every other week. These meetings were also attended by Madson and Fredericksen, as well as Gadd on occasion. These meetings were also attended by members of the finance and supply chain teams. The quarterly goals and the pressure from Erter were discussed by the finance team during these meetings, as well as how they could "close the gap" between sales and goals. They also discussed which customers would be offered discounts. One of the topics that was frequently discussed during these meetings was whether James Hardie had the manufacturing capacity to supply enough inventory when the company was going to offer large discounts to pull in sales.

46. FE 1 also stated that there was a push to close the fiscal 2024 year on a "high note." FE 1 recalled speaking to the finance team and asking why orders from F1Q25 were still being pulled into F4Q24 when the company had such a great year. This practice seemed

"counterintuitive" to FE 1, and FE 1 did not understand why the company would "steal" from the next year when it had performed so well.[2]

47. According to FE 1, in April 2025, James Hardie planned to stop the practice of offering heavy discounting in the first quarter of the fiscal year to stop this "pattern" of pulling in sales. But around late May 2025, the sales team still wanted to pull in sales from F2Q25 by offering heavy discounts, which FE 1 questioned and raised concerns about during a North American leadership team meeting. FE 1 questioned why the sales team wanted to make the quarter "less terrible" when it was already known internally that it was going to be disappointing. FE 1 recalled that members of the finance and supply chain teams that were also present at the meeting agreed with FE 1 that the sales should not be pulled in. However, FE 1 did not know exactly what the final decision was regarding discounting for that quarter and said that it would have been made by a small group within the finance team.

48. **Former Employee 2 ("FE 2"):** FE 2 worked at James Hardie as a Regional Account Manager from September 2022 to December 2024, and as an Account Manager – Multifamily/Commercial from November 2024 to May 2025. FE 2's position entailed reaching out to builders, developers, architects and subcontractors engaged in multifamily home construction (and which FE 2 had also been previously doing while a Regional Account Manager for single-family construction for Northern California). Additionally, FE 2 dealt with various distributors and dealers, although this was more the case when FE 2 was a Regional Account Manager for single-family. These included several one-step distributors, including Builder's First Source, 84 Lumber, and ABC Supply, as well as two-step distributors such as Golden State

[2] It was around this time that James Hardie was negotiating to acquire AZEK and the acquisition was announced on March 24, 2025.

Lumber (which was apparently quite large), and a number of smaller, local dealers, including Big Creek Lumber, Meek's Lumber, and Berry Lumber.

49. FE 2 said that James Hardie always announced a price increase around October with the increase going into effect in January of the upcoming year; and in that regard, calendar 2024 was no different. Accordingly, there was typically "a huge push from James Hardie" to get the distributors and dealers to stock as much inventory as possible before the end of a calendar year. FE 2 noted that some of the smaller, regional two-stepper dealers (e.g., Big Creek Lumber, Meek's Lumber, and Berry Lumber) sometimes took on as much as six-month's worth of inventory prior to upcoming price increases. FE 2 added that the one-steppers typically gauged how much product they were willing to allocate to the two-steppers at the old prices. FE 2 said that James Hardie sometimes entered into agreements with some of the distributors "to sit on inventory" such that they had upwards of six-months of inventory on-hand.

50. FE 2 said that internally at James Hardie there had not been an anticipation of a "boom" in sales going into (calendar) 2025, but that there would be an increase to some extent of housing starts. However, the new housing starts that had been anticipated for (calendar) 2025 apparently did *not* materialize. This lack of new housing starts was especially the case in the Southeastern US, which FE 2 said "took a massive hit" in (calendar) 2025) compared to prior years. FE 2 knew about the lack of new housing starts and the impact this especially had in the Southeastern US by way of FE 2's attendance at quarterly calls held by James Hardie's senior leadership with employees. More specifically, FE 2 heard this in the last of these quarterly calls which was held in April 2025. Additionally, FE 2 had access to James Hardie's Salesforce Tableau application which not only enabled FE 2 to see how sales were performing in their region, but anywhere else in the US. Based on what FE 2 saw in the Salesforce Tableau application prior to

their departure from the Company in May 2025, there had been "a little dip" in FE 2's territory, but that the biggest dips – "almost double-digits" in (calendar) 2025 compared to the same period in (calendar) 2024 – in the Southeast, particularly Texas, Florida, and South Carolina, which were predominantly single-family construction markets. As FE 2 described, there had been "a significant dip" in sales in January and February 2025 "because of the pre-buying" that had taken place in (calendar) 2024, although such a sales slowdown in those months was typical. Sales in January 2025 and February 2025 were "almost dead," but new housing starts were also slow in this same timeframe compared to prior years.

51. FE 2 understood that in early 2025 distributors and dealers were sitting on excessive levels of inventory and that California distributors had taken on "big chunks of inventory." FE 2 could see this based on how much the distributors had purchased, as well as from comments made informally by some of the individuals involved in purchasing at the distributors at the branch level. FE 2 noted that many of the distributors had an automated ordering process in place with James Hardie. When asked if the level of inventory in the channel being potentially excessive going into (calendar) 2025 had been concerning, FE 2 said, "I think, yes." However, not only were sales virtually nonexistent in January and February 2025, but there were still "not many orders" in March and April 2025. Apparently, orders started to pick up in April 2025, although this was mainly coming from smaller dealers and distributors and there was "a lot of destocking" also taking place amongst the distributors beginning in April 2025. According to FE 2 this was known because "we measure" the inventory levels at the distributors. James Hardie's Strategic Account Managers were the primary individuals responsible for monitoring inventory levels of the large, one-stepper distributors. FE 2 relied on what "the local guys" who worked for the distributors at the branch-level "tell us," plus it was possible to see the actual amount of inventory being held at the local

level, as well as examining "purchase logs" that showed how much a distributor branch had purchased in a given period.

52. FE 2 explained that James Hardie employed a Virtually Managed Inventory system for large distributors to store James Hardie inventory. This usually entailed James Hardie making certain guarantees with the distributor, such as James Hardie agreeing to pay for any damaged inventory and/or taking back inventory from the distributor, as well as also taking care of replenishing inventory when it fell below certain levels on behalf of the distributor.

53. FE 2 said that James Hardie's National Account Managers tracked inventory being held by major distributors.

54. **Former Employee 3 ("FE 3"):** FE 3 served as a Business Development Manager at James Hardie from January 2020 to November 2025. FE 3 reported to two Regional Sales Managers, who in turn reported to an Area Regional Manager and indirectly to the Senior Director for the Northeast.

55. FE 3 stated that most of James Hardie's large wholesalers had Virtually Managed Inventory (VMI) whereby James Hardie controlled the inventory the distributors had for each stock keeping unit ("SKU"), which included replenishing distributor inventories. FE 3 also stated dealers discussed the amount of "days on hand" inventory.

56. FE 3 stated that in 2025, dealers had been having more difficulty keeping the inventory below their targeted inventory levels since the economy and sales had slowed down. FE 3 explained there were a couple times where James Hardie bought back "truckloads" of inventory from dealers because they had too much.

57. **Former Employee 4 ("FE 4"):** FE 4 was a Technical Sales Manager at James Hardie from April 2021 to August 2025 and previously held several other positions at James

Hardie beginning in August 2014. In FE 4's position as Technical Sales Manager, FE 4 worked with contractors and homebuilders engaged in new, single-family home construction, as well as with local channel partners that carried James Hardie products.

58. FE 4 stated that James Hardie's inventory data included inventory turnover, which is a financial metric indicating how many times a company has sold and replaced its inventory during a given period. The number and frequency of inventory turnover was a topic discussed on internal calls that occurred regularly on a monthly and quarterly basis.

## V. FACTUAL ALLEGATIONS

### A. Overview of James Hardie's North America Fiber Cement Business

59. James Hardie manufactures and sells fiber cement, fiber gypsum and cement-bonded building products for interior and exterior building construction applications in the United States, Australia, Europe, and New Zealand. The Company markets its fiber cement products and systems under the Hardie brand, its fiber gypsum and cement-bonded boards under the fermacell brand, and fire-protection boards under the AESTUVER brand.

60. During the Class Period, James Hardie had three reportable segments: North America Fiber Cement, Asia Pacific Fiber Cement and Europe Building Products. The North America segment was its largest, generating about 80% of the Company's earnings.

61. In North America, the largest application for fiber cement building products is in external siding for the residential building industry. James Hardie sells its exterior fiber cement products for repair, remodel, and new residential construction to distributors, who then sell the products to dealers or lumber yards. About 88% of James Hardie's North America business was comprised of external siding products. Its main exterior products are plank (horizontal fiber cement siding), panel (vertical fiber cement siding), shingle (smaller rectangle-shaped siding), trim (fiber

cement products for corners, columns, fascia, doors and window), and soffit (coverage for the underside of roof eaves and exterior porch ceiling).

62. The remaining 12% of James Hardie's North America business was comprised of interior fiber cement products, typically "backer," which is cement board installed as backing for tiles. The Company's interior fiber cement products in North America are typically sold through large home center retailers and specialist distributors or dealers.

### B. After a Destocking Incident in 2022, Erter and Wilson Assured Investors They Would Effectively Manage Channel Inventory Levels on Behalf of Distributors and Dealers

63. Because its North America fiber cement products are central to James Hardie's business, Defendants have a thorough process for monitoring its inventory to estimate future demand, stating the following in James Hardie's Annual Report on Form 20-F filed with the SEC on May 20, 2025 (the "2025 20-F"):

> Inventories are recorded at the lower of cost or net realizable value. ***In order to determine net realizable value, management regularly reviews inventory quantities on hand and evaluates significant items to determine whether they are excess, slow-moving or obsolete.*** The estimated value of excess, slow-moving and obsolete inventory is recorded as a reduction to inventory and an expense in cost of sales in the period in which it is identified. ***This estimate requires management to make judgments about the future demand for inventory and is therefore at risk to change from period to period.*** If our estimate for the future demand for inventory is greater than actual demand and we fail to reduce manufacturing output accordingly, we could be required to record additional inventory reserves, which would have a negative impact on our gross profit.

64. In addition, "***On a regular basis, the Company evaluates its inventory balances*** for excess quantities and obsolescence by analyzing demand, inventory on hand, sales levels and other information. Based on these evaluations, inventory costs are adjusted to net realizable value, if necessary."

65. Following a prior incident of significant customer destocking in 2022, James Hardie's channel inventory has been a primary topic of interest for analysts following the

Company, and both Erter and Wilson represented that they were taking a more comprehensive and active approach to effectively managing inventory levels.

66. On November 7, 2022, Erter revealed that customers in North America asked to "partner[] with us to lower their inventory levels" which would have a devastating impact on James Hardie's results. In particular, Erter stated "we now expect second half volume growth to be between negative 5% and negative 8% to the prior year, which is a significant reduction to our August-September projections." In reaction to this news, James Hardie's ADS price fell over 16%, declining from its closing price of $21.35 on November 7, 2022 to $19.14 on November 8 and $17.93 on November 9, 2022. As a result of this, analysts remembered to ask about "inventory levels in the channel" at the next earnings call on February 13, 2023, and again about any "channel movements" in August 2023.

67. Soon after that incident, and after fielding analyst questions about the channel in the following earnings calls, Jason Miele, James Hardie's prior CFO, "stepped down" from the Company on August 16, 2023 and was replaced by Defendant Wilson. During her first earnings call as CFO, on November 7, 2023, in response to another analyst question about channel inventories, Wilson assured investors that,

> [O]n the inventory***, we're doing a lot more with customer integration. So with the customer integration, we're specifically getting a tighter look on their inventory with our top customers, largely driven the North America***. From that inventory, look, we are getting that close inventory. Look, not only is that a demand signal for us, but ***it is also a great way for us to efficiently manage their inventory and our inventory.***

68. On the same call, Erter responded to a question from analyst Keith Chau from MST about "channel risk" by assuring investors that channels were normalized, stating, "as far as inventories in the channel, it's normalized to us. We don't see any noticeable difference of it being

stopped or thin." Erter likewise detailed "customer integration" and increased monitoring to prevent recurrent issues in the future, stating:

> [O]ur customer integration keeps getting better and better. That's not only our relationships with our customers, but also ***the data in which they're giving us, which is helping us as it relates to helping them, right, to have the right inventory and where they need it.***
>
> Just to give you a stat, we've taken our largest customers, ***we had about 30% of them that gave us data. Now we're closer to 70% this year***. So that's number one. The other thing, I think, that's different is we're getting more specialized from a sales standpoint. When I talk about investments, we're making investments to get specialized in certain areas. So for instance, when we think about single-family new constructions, it's putting people on that's focused on some of those large builders, but also moving past the Top 25 to the Top 200 as well. So I think those are 2 of the noticeable changes that we've made within the last year that we're seeing benefits from, Keith.

69. The "customer integration" both Erter and Wilson referred to is generally defined as the process of unifying customer data from across an organization to gain a more complete view of the customer's history and needs. It involves integrating sources that store customer and inventory data, including systems and platforms that record, store, and manage information about products and stock levels.

70. The particular system James Hardie used, confirmed by FEs 1, 2, and 3, was Vendor Managed Inventory (VMI), whereby James Hardie took responsibility for monitoring and replenishing their dealers' and distributors' inventory levels using real-time data sharing. Through this approach, suppliers rather than buyers generate replenishment orders based on agreed-upon minimum and maximum inventory thresholds. VMI is aimed at reducing both shortages and surpluses of inventory. Erter explicitly described their process as such, stating, "the data in which they're giving us, which is helping us as it relates to helping them, right, ***to have the right inventory and where they need it***." Erter assured investors that James Hardie had about 70% of their customers' data, compared to the 30% at the time the channel overloaded in November 2022.

71. FE 3 also stated that James Hardie used VMI to control the inventory the distributors had for each stock keeping unit (SKU), which included replenishing distributor inventories. The term "stock keeping unit" in manufacturing refers to the unique code assigned to a specific product variant to track inventory internally. SKUs are used to monitor inventory levels, streamline the picking process, and automate reorder points, reducing stock-outs and errors. They can also track production, batch numbers, and warehouse locations with precision.

72. In addition to managing distributors' inventory levels for them, including deciding when to replenish those inventories, James Hardie also did not have to transfer possession of the inventory in order to recognize revenue. James Hardie's 2025 20-F stated, "A portion of the Company's revenue is made through ***distributors under vendor managed inventory agreements whereby revenue is recognized upon the transfer of title and risk of loss to the distributors***." While James Hardie's revenue is "generally" recognized "upon delivery," their performance obligation and revenue recognition could be different "depending on the terms of the underlying contract[.]" This ability to recognize revenue without actually delivering products made it easier for Defendants' misrepresentations to go undetected. It also prevented James Hardie's sales from being constrained by the physical space allocated by its distributors and dealers.

73. In addition to monitoring inventory levels, James Hardie also closely monitored end-user demand to, in turn, increase its sales to distributors and dealers. To ensure its products will move through the channel, James Hardie markets directly to end-users, including homeowners, architects, builders, and contractors. Because James Hardie holds approximately 90% of the fiber cement market share in North America, market competition primarily stems from substitute products, such as wood or brick. To remain competitive, James Hardie maintains a

specialized sales force and customer service infrastructure in North America and developed targeted marketing programs.

74. Indeed, Defendants repeatedly highlighted the Company's involvement in promoting and monitoring end-user demand, including, as stated in James Hardie's 2025 20-F, by providing "support directly to the customers of these distribution channels, principally homebuilders and building contractors" and "maintain[ing] relationships with national and other major accounts" through their regional sales management teams.

75. By monitoring both inventory and end-user demand, James Hardie positioned itself to fully to manage the fiber cement channel on behalf of distributors and dealers. Erter and Wilson also committed to increased "customer integration" of inventory data to prevent another customer destocking issue in the future. After placing themselves in a position of trust with dealers and distributors, Defendants abused that position to make the Company appear more profitable. As FE 1 detailed, Defendants used aggressive discounts at the end of each quarter and overloaded distributors and dealers with additional inventory that continued to accumulate.

### C. Defendants Overloaded James Hardie's Distributors and Dealers with Excess Inventory to Artificially Boost Sales and Knew About Customer "Destocking" by April 2025

76. As detailed above by FE 1, prior to and during the Class Period, James Hardie's sales team was instructed by Erter to use aggressive discounts at the end of each quarter to pull forward sales and revenue for the current quarter, which resulted in stealing business from future quarters.

77. At year-end 2024 and into 2025, James Hardie offered significant discounts to customers at a time when demand for its products was softening, which led to oversupplied distributors with more products than they could sell. This strategy was done to make the Company

appear more profitable and created the appearance of increased demand and sales. Defendants, however, knew their inventory channel would was overstuffed far in excess of demand. Both Defendants and analysts had already been attuned to the risks of customer destocking from a similar incident back in 2022.

78. As FE 2 stated, sales were virtually nonexistent in January and February 2025, and there were still "not many orders" in March and April 2025. Apparently, orders started to slightly pick up in April 2025, although this was mainly coming from smaller dealers and distributors. FE 2 said there was "a lot of destocking" taking place amongst the larger distributors.

79. Indeed, Erter confirmed that he had been monitoring channel inventory during the Class Period and admitted on August 19, "uncertainty built ***throughout April and early May***." James Hardie's customers "were managing their inventory" in April and "***we already started to see a little bit of that destock as you talk about April through May***."

80. Despite "start[ing] to see" the destock in April, Defendants made numerous misstatements on May 20 and 21, 2025 that the North America segment remained strong despite the challenging market environment and denying that inventory destocking would be an issue.

81. The same MST analyst that asked about channel inventory in November 2022, Keith Chau, explicitly asked Erter on May 20, 2025, "how you're thinking about channel inventory levels and ***whether there is risk of destocking just going back to the experience in 2022***." In response, Erter falsely stated, "I would say that ***we are seeing normal stock levels out there*** just as a general statement." Despite having seen customers destocking in April and early May, and knowing full well that investors were concerned about destocking, Erter misrepresented that there were any concerns. Because James Hardie did not publicly report channel inventory levels, investors had to take Erter at his word. But Defendants knew investors would have found it

significant that North America revenues were being driven by inflated channel inventory and not increased end-user demand, because those forces fundamentally differ in sustainability.

82. Erter also assured investors that the market environment and demand would be no concern, even though demand was decreasing and would soon have the impact of revealing their overstuffed inventory channel. On the same May 20 earnings call, Erter stated that despite a "more challenging market environment," James Hardie was well-positioned to "sustain" its current "outperformance in our markets." Erter also clarified that "[o]ur team is poised to execute on FY '26." These statements were likewise false and misleading in light of the "destocking" Erter admitted he saw by at least April.

### D. Defendants Concealed The Inventory Destocking Issues To Avoid Further Investor Backlash After Investors Reacted Negatively To The AZEK Acquisition

83. About a month before Erter "started to see" destocking, James Hardie announced that it planned to acquire AZEK for a combination of cash and stock for a total value of $8.75 billion in March 2025. AZEK was a United States manufacturer of decking, trim, and other outdoor building materials. Defendants promoted the merger as expanding James Hardie's reach to the broader "outdoor living" category. As a result of the deal, James Hardie would also change its primary listing from the Australian Stock Exchange (ASX) to the NYSE.

84. The acquisition closed on July 1, 2025 for an implied value of $8.4 billion, including the value of share-based awards and the repayment of AZEK's outstanding debt. AZEK shareholders received $26.45 in cash and 1.0340 ordinary shares of James Hardie for each share of AZEK common stock held for a total of $54.18 per share. The cash and stock combination was valued at $56.88 and 26% of the combined Company. This was a 37% premium to AZEK's last closing share price. Under Australian listing rules, James Hardie was not required to obtain shareholder approval for the acquisition.

85. Almost immediately after the deal was announced on March 24, 2025, investors expressed surprise and concern that James Hardie was overpaying for an acquisition that did not align with its core fiber cement business. Taking Defendants' representations about the North America fiber cement business as true, investors believed James Hardie could continue to meet expectations in the North America segment due to its strong market position and sustainable demand in the U.S. renovation market. In contrast, the U.S. outdoor products sector AZEK operated in was more competitive and uncertain, and its prospects did not seem to justify the high cost of the acquisition.

86. Underscoring investors' unhappiness with the deal, James Hardie's stock declined by 18.9% on the announcement of the AZEK acquisition, falling from its closing price of $29.28 on March 21, 2025 to $24.25 on March 24 and $23.80 on March 25, 2025. Erter misrepresented problems with James Hardie's inventory levels on the May 20, 2025 earnings call to avoid further investor backlash and stock price decline and to ensure that the AZEK merger would go through.

87. On April 15, 2025, a group of investors, including large pension funds such as AustralianSuper and UniSuper and institutional investors such as Schroder Investment and Fidelity Australia, wrote to the ASX and requested new listing rules to require shareholder approval for share issuance above a certain threshold and for modifications to listings.

88. In the face of investor concerns, Defendants did not disclose the underlying issues in James Hardie's North America segment that would have provided context for the acquisition. Instead, Defendant Erter gave investors the impression that AZEK would fuel the North America segment's revenue even more by significantly elevating James Hardie's brand recognition and marketing. On May 20, 2025, Erter stated that AZEK would "increase brand visibility and product

availability" to "further accelerate our sales growth" and "[o]ur combined business will be an engine of tremendous cash flow generation."

89. Unbeknownst to investors, combining the North America segment with AZEK could have further concealed Defendants' fraud. To avoid ever revealing the truth about overstuffed inventory channels, Defendants intended to hide behind the AZEK acquisition to boost the North America segment before the overloaded inventory channels had to be revealed. Indeed, after the Class Period, James Hardie combined its North America business with AZEK's North America Exteriors into a single "Siding & Trim" segment. Siding & Trim remains the Company's largest source of revenue, but investors will no longer receive a full breakdown of the performance of its legacy fiber cement business in comparison to its new AZEK business.

90. Contrary to the impression Erter's statements gave investors of "further accelerat[ing] our sales growth" and "increase[d] brand recognition," the addition of AZEK was not enough to compensate for North America segment's excess inventory problem. Not only did Defendants explicitly deny the risk of destocking and demand issues in North America, but they also sold investors on new growth from AZEK's exteriors business.

### E. James Hardie's Overstuffed Channel Becomes Too Big to Hide and James Hardie is Forced to Reveal the Truth

91. The truth about Defendants' misrepresentations was revealed after the close of trading on August 19, 2025, when James Hardie reported that North America Fiber Cement sales declined by 12%, Q1 2026 profit declined by 29%, and projected lower-than-expected fiscal 2026 earnings. James Hardie admitted that its disappointing results largely reflect "***expected normalization of channel inventories*** due to moderating growth expectations by our customers ***as uncertainty built throughout April and early May***." Defendant Erter also indicated that this "normalization" would continue, stating, "we believe it is prudent to plan for more cautious order

patterns and ***defensive inventory positioning*** at our channel partners, exacerbated by the slower seasonality of new construction ***into the back half of the calendar year***."

92. Erter also admitted that James Hardie would be adjusting to decreased demand, despite previously claiming it would not be a concern, stating:

> In May, we built into our full year guidance and assumption that end market demand could decline by approximately mid-single digits, driven by expectations for further decline in repair and remodel. Over the course of the summer, single-family new construction activity has been weaker than anticipated, and we have adjusted our expectations to account for softer demand. Furthermore, we believe it is prudent to plan for more cautious order patterns and defensive inventory positioning at our channel partners, exacerbated by the slower seasonality of new construction into the back half of the calendar year. Amidst this dynamic, we're also conservatively expecting to benefit from recent homebuilder exclusivity wins and new product launches more so in FY '27 and beyond rather than the back half of FY '26 and as previously planned.

93. While Erter claimed that he previously "talked about inventory being relatively normalized" on the May 20, 2025 conference call, James Hardie had projected that North America net sales growth would be "up low single-digits," and an analyst from MST Financial Services challenged the implication that issue had been disclosed, stating, "So you mentioned we spoke about it at the last quarter, which we certainly did and that was 7.5 weeks into the quarter. So the destocking into the second half of the quarter must have been quite severe." In response, Erter provided more detail on the inventory destocking timeline, stating:

> Let me give you a little bit of a time line when we think about inventory here. We talked -- just talked about it, but I'll reiterate it again. ***So Q4 FY '25 in March, we sold our customers prepared for growth. right? You think about the time, the election ended up happening in November, people were ready for growth.*** Look, and we talked about inventory not too high, but full well positioned for growth in the building season out there. As we got into April, we cited this on the call, a little bit of noise, a little bit of uncertainty. You get into May, we have our call, June environment softening. As we got into April, people were managing their inventory, right? ***So we already started to see a little bit of that destock as you talk about April through May.*** And then look, as we got into July, June, it was softening and then as we got into July, we really saw customers getting into defensive inventory posture.

94. Thus, despite starting to see the destock in April and early May, Defendants made numerous statements on May 20 and 21, 2025 falsely assuring investors that the North America segment remained strong despite the challenging market environment and denying that inventory destocking would be an issue.

95. Wall Street analysts also expressed shock in response to the news. A report by Truist Securities on August 20, 2025, titled "Dramatic Miss on Results Raises More Than Just Weak Homebuilder Market Questions on Share" commented on "shockingly low FY26 guide despite now including Azek." William Blair noted that "channel de-stocking" was a "big negative surprise" and that the "big miss and guide reset is hard to defend." A report published by Macquarie, also on August 20, called James Hardie "clear as mud" and stated its FY26 guidance "disappoints." CLSA later published a report on August 21, 2025 titled "Rude awakening" and stated "JHX's revelations of customer destocking, particularly in the US Southern region, is concerning in our view." In addition, "the magnitude of JHX's miss raises some questions over management's visibility and internal systems, in our view."

### F. Post Class Period Developments

96. As of December 2025, the Company changed its segment reporting structure to conceal its legacy North America business within AZEK as originally planned. Under its revised reporting structure, North America Fiber Cement segment was integrated with the acquired AZEK North America Exteriors business to form a new segment called Siding & Trim. Additionally, the Company created a Deck, Rail & Accessories segment which includes the remainder of AZEK's North America "outdoor living" business. The legacy Asia Pacific Fiber Cement segment was renamed the Australia & New Zealand segment, and the legacy Europe Building Products segment was renamed the Europe segment.

97. The Siding & Trim segment remains the Company's largest source of revenue, but investors no longer receive a full breakdown of the performance of its legacy fiber cement business in comparison to its new AZEK business.

98. In addition, Defendant Wilson "stepped down" as CFO of the Company on November 17, 2025, and was replaced by Ryan Lada, the former CFO of AZEK.

99. Later, on February 10, 2026, James Hardie held an earnings call for Q3 2026 quarterly results and Erter discussed how channel inventories remained elevated. Erter reminded investors that, "one of the things I think that you'll remember is ***we*** are facing a comp from an inventory build that we saw in Q4 last year." In response to an analyst's question about "near term" expectations, Erter responded that Texas builders "have been tightly managing inventory" and "[a]fter significant volume declines in Q3" James Hardie was finally seeing "some signs of normalization early in the calendar year" and "[i]t's choppy, but it's stabilizing. We're not seeing it getting any worse, which is good." But still, "***Inventory in key markets like Orlando, Jacksonville, Tampa and Atlanta remain elevated***[,]" "[b]uilders across the Southwest and Mountain states, ***they're overbuilt in inventory right now***[,]" and "overall, in new construction, it's soft across many of the key regions. ***Inventory levels are elevated***." Lada also referred to James Hardie's inventory needing to "normalize[]" and "rebalance."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

100. During the Class Period, Defendants (i) made materially false and misleading statements, as stated in detail below, and (ii) omitted material facts. Defendants omitted the material fact that James Hardie's sales volume was being driven by unsustainable discounting that increased channel inventory and lowered demand. Investors remained unaware that James Hardie was experiencing weakening demand and increased concentration of inventory in the sales

channel, and the associated impact on James Hardie's current and future financial results. The omitted facts were material to investors, as they concerned the Company's largest and most lucrative source of revenue and had been a topic of direct questioning by analysts since November 2022.

**A. May 20, 2025 Earnings Call and Form 20-F**

101. The Class Period starts on May 20, 2025, when James Hardie filed its Form 20-F for the fiscal year with the SEC and held an earnings call about its reported financial results for its fiscal 2025 fourth quarter. On the earnings call, Erter spoke confidently about North America growth despite the challenging market environment, stating:

> ***Our full year business results demonstrate the inherent strength of our unique value proposition and the underlying momentum in our strategy against a softer market environment. We delivered 2.95 billion standard feet of volume in North America, within the range we guided to a year ago despite softer end market demand than we had originally anticipated***. Our North America EBIT margin of 29.4% shows how we generate savings through the Hardie operating system and quickly and decisively prioritize consistent high-return investments in organic growth and organizational scale. This result exceeded our initial commitment for profitability.
>
> ***In a difficult North America market environment in FY '25, we generated $2.9 billion in North America sales along with $1 billion of EBITDA, resulting in a 35% EBITDA margin. And finally, we generated $644 million of adjusted net income, again driving performance that exceeded the commitments we made last May, thanks to purposeful execution by each of our business teams around the globe.***
>
> As we turn our focus towards continuing our material conversion mission, I reflect with pride on the resilience our teams have shown as our industry faces persistent headwinds. More recent broader macroeconomic uncertainty could further impact the cost of home construction and weigh on consumer sentiment, influencing demand. As a result, in North America, which represents approximately 3/4 of our total net sales, we are prudently planning for market volumes to contract in FY '26, including a fourth consecutive year of declines in large ticket repair and remodel activity.
>
> ***Despite near-term headwinds, the strength of our brand and the attractiveness of our value proposition to customers has and will enable James Hardie to structurally grow through expansions and contractions. We will continue to***

> ***capitalize on these strengths as we navigate through the current backdrop, focusing on outperforming our end markets to drive top and bottom line in FY '26, consistent with our prior planning assumptions.***

102. The statements referenced above in ¶101 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to James Hardie's North America segment. Rather than being able to "outperform[] our end markets" "[d]espite near-term headwinds," customer demand and growth in James Hardie's North America segment were deteriorating. Instead of customer demand, overstocking James Hardie's distributors and dealers with inventory was the primary driver of North America growth during the Class Period. As a result, investors were unaware that there was excessive inventory at James Hardie's North America distributors. For these reasons, James Hardie's business results "did not demonstrate the inherent strength of our unique value proposition and the underlying momentum in our strategy against a softer market environment." The company's fiscal 2025 results were also misleading for failing to disclose that channel inventory was unsustainable and would eventually need to normalize. Without the artificial boost from selling beyond demand and increasing its channel inventory to unsustainable levels, James Hardie's reported financial results would have been materially different.

103. As detailed by FE 1, Erter placed a lot of pressure on North America segment employees to meet goals ahead of earnings calls, which resulted in "concerted efforts" to make each quarter's goal by pulling in sales from the following quarter. During FE 1's entire tenure, as each quarter closed there was a "mad rush" to pull sales forward from the ensuing quarter through discounts to distributors and dealers to meet sales goals for that period. FE 1 was copied and/or shown on emails that were sent to the North American leadership team, including some by Erter, in which employees discussed pulling in sales to meet financial goals because Erter was preparing

for upcoming earnings calls. FE 1 stated that James Hardie's Senior Director of Commercial Operations, the Chief Sales Officer, and a VP of North American Professional Channel also received these emails. The first email in the chain was typically from the President of the North America segment explaining that Erter wanted the company to meet their targets. Other times, the email was sent directly from Erter, which the President of the North America segment forwarded to the rest of the North American leadership team. The personnel copied on the emails were aware of the pressure from Erter and the practice of pulling in sales.

104. Erter confirmed that he had been monitoring channel inventory during the Class Period and admitted on August 19, "uncertainty built ***throughout April and early May***." James Hardie's customers "were managing their inventory" in April and "***we already started to see a little bit of that destock as you talk about April through May***." Defendants had been attuned to the risks of customer destocking in 2022 and subsequently committed to increased "customer integration" of inventory data to prevent another customer destocking issue in the future. By monitoring both inventory and end-user demand, James Hardie fully managed the fiber cement channel on behalf of distributors and dealers. After placing themselves in a position of trust with dealers and distributors, Defendants abused that position to make the Company appear more profitable. Defendants were attuned to the risks of customer destocking in 2022 and subsequently committed to increased "customer integration" of inventory data to prevent another customer destocking issue in the future. By monitoring both inventory and end-user demand, James Hardie fully managed the fiber cement channel on behalf of distributors and dealers. After placing themselves in a position of trust with dealers and distributors, Defendants abused that position to make the Company appear more profitable.

105. FE 2 further confirmed there was "a lot of destocking" by the larger distributors in the first quarter of 2025. FE 2 understood that in early 2025 distributors and dealers were sitting on excessive levels of inventory and that California distributors had taken on "big chunks of inventory." As noted above, FE 2 stated that sales had been virtually nonexistent in January and February 2025, and there still were "not many orders" in March and April 2025. There was also "a lot of destocking" taking place amongst the distributors in April 2025, which FE 2 knew about because James Hardie measured inventory levels at the distributors.

106. Defendant Erter further stated, on the May 20, 2025 earnings call, in pertinent part:

> Now please turn to Slide 5, where I will review our recent performance and accomplishments within our North America single-family exteriors business. We delivered upon our North America volume guidance this year despite challenges across our end markets. During FY '25, multifamily, which has been a low double-digit percentage of segment volumes the past 2 years saw a significant market correction, but we outperformed despite our volumes falling over 20%, lapping record performance from FY '24. Multifamily remains an attractive long-term segment for us beyond this near-term normalization and market activity.
>
> Interiors, which is around 10% of segment volumes declined as well, falling high single digits as the discretionary interior remodeling market remains soft. ***The vast majority of our North America business that is neither multifamily nor interiors is growing. This represents our siding, trim and soffit products across both repair and remodel and single-family new construction. This growth reflects the encouraging results of our long-term purposeful strategic actions to grow our share with the national homebuilders and expand our presence in key repair and remodel geographies.***
>
> ***Our growth in FY '25 through market declines proves we are executing on our plan to win in these large material conversion opportunities. This outperformance in single-family exteriors is attributable to strategies like leveraging innovative product solutions such as ColorPlus.*** Our ColorPlus offering remains strategically important across both single-family new construction and repair and remodel, and our focused efforts and investments enabled double-digit growth in FY '25.

107. The statements referenced above in ¶106 were materially false and/or misleading for the same reasons described in ¶¶102-105. Stating that the vast majority of the North America business was "growing" reflecting the "results of our long-term purposeful strategic actions to

grow our share…and expand our presence" was misleading because overstocking James Hardie's distributors and dealers with inventory, as a result of pressure from Defendant Erter, was the primary driver of North America growth during the Class Period.

108. Defendant Erter assured investors that, "Core to our strategy is winning against vinyl within repair and remodel by strengthening our presence in the Northeast and Midwest, two regions ripe for material conversion through the residing of aging homes with appreciated values that remain clad with other substrates." To that end, Erter touted the performance of James Hardie's sales team in its North America segment and stated:

> ***Key to our success has been our ability to rapidly onboard new contractors to the ALLIANCE, our loyalty program that we will continue to grow and enhance over the coming years.*** Approximately 40% of new contractors added this year were introduced to the program by a customer sales representative, a clear proof point of how we have amplified our commercial efforts by leveraging our deep partnership with our customers, leading to not just hundreds but thousands of feet on the street.
>
> Importantly, as we accelerate sales with siding and decking contractors to capture the vast opportunities that lie ahead, ***the size and strength of our sales force and the alignment with our customer sales teams underscores our supreme confidence in achieving our commercial synergy commitments.*** Nobody in the industry has a sales force like James Hardie.
>
> Turning to new construction. We continue to achieve success in deepening our partnerships and supporting homebuilders' growth objectives. Over the last year, in a clear demonstration of the appreciation for our innovative product solutions and unrivaled business support, we have announced multiyear national hard siding and trim exclusivity agreements with the following: Meritage Homes, M/I Homes, David Weekley Homes, Stanley Martin Homes, CastleRock Communities, Trumark Homes, CBH Homes, Davidson Homes, and McKinley Homes. ***Our customer drive, our innovation focus and our broad product range continually deliver material conversion wins. Beyond our homebuilder exclusivity agreements, we have demonstrated success in accelerating our material conversion opportunity in new construction from vinyl to James Hardie fiber cement.***
>
> Let me share a few examples around how we are doing this. In many cases, we win on the absolute value proposition alone as homebuilders see that buyers are motivated by the resilient beauty of our products. In other cases, we are increasingly reducing overall switching costs by innovating through ColorPlus and around the installation process. In parts of the Midwest and specifically with our Statement

> Collection, we are piloting products that are quicker and easier to install and thus reduce the on-the-wall costs. The early results are highly encouraging and demonstrate the potential to unlock a large range of addressable homes at more affordable price points.
>
> By highlighting and enhancing the James Hardie value proposition, we've become increasingly successful at convincing large homebuilder partners to convert from vinyl to fiber cement. Our builder partner, Van Metre Homes, who many of you saw at our Investor Day, recently dropped vinyl from their designs in favor of fiber cement, highlighting our ability to meet the desires of homebuyers across different price points and innovate to improve the installed cost of our product.

109. The statements referenced above in ¶108 were materially false and/or misleading for the same reasons described in ¶¶102-105. Touting the performance of James Hardie's sales team was misleading because customer demand and growth in the North America segment were deteriorating. Instead of customer demand and onboarding new customers through sales and marketing initiatives, overstocking James Hardie's distributors and dealers with inventory was the primary driver of North America growth during the Class Period.

110. Erter further stated:

> I'd like to take this opportunity to reiterate that ***we remain well positioned to execute on the growth objectives we outlined at our Investor Day last June. They are to drive long-term profitable growth in our organic fiber cement business and to take advantage of the significant material conversion opportunity in front of us.***
>
> Within repair and remodel, long-term market fundamentals are highly supportive with over 35 million homes aged 20 to 40 years, the prime age for replacing or improving exterior siding. 10 million vinyl homes alone have been built over the past 30 years, or an easy way to think about the tremendous opportunity is almost 80% of the homes in the United States today are not sided with fiber cement. And in new construction, the fiber cement category has grown structurally for decades with further opportunity to expand in the decades to come. This is particularly true with large builders seeking to drive further value for the homeowner with aesthetics and durability of the product, differentiate increasingly standardized homes through customization of exterior visuals and to achieve labor savings through innovative solutions such as our prefinished ColorPlus technology.
>
> We often talk about our path for value creation, and we see immense material conversion opportunity as the fuel for our growth engine. But to capture this opportunity requires the elements we have refined over the years, creating demand

across the value chain by being the brand of choice, providing customers with innovative solutions and supporting the growth of our partners through unrivaled business support and localized manufacturing.

I had the pleasure of visiting with hundreds of valued customers and business partners at the International Builders' Show in late February, where we showcased many of our new and innovative product offerings. Our focus on innovation continues to resonate with our customers, and we believe our winning solutions will accelerate our material conversion efforts.

* * *

***In North America, we remain steadfast in our commitment to driving double-digit revenue growth over the long term, which is built on low single-digit underlying market growth, approximately 4 points of outperformance versus our end markets through time and an expectation to grow value faster than volumes by an additional mid-single digits. It also remains our expectation that organically, we will expand our North America EBITDA margin by 500 basis points, enabling us to triple our EBITDA.*** We have stated this path will not be linear. However, we are highly confident we will achieve our objectives over the long term.

111. Defendant Wilson also touted James Hardie's North America results, stating:

We again delivered solid results to close out FY '25 performance while remaining focused on scaling the organization and investing to profitably grow our business. ***We achieved each of our FY '25 guidance metrics despite a more challenging macro environment as compared to May of last year when we initially provided this outlook***.

***In North America, our team delivered a solid fourth quarter, and we achieved our guidance points both in our second half and full year for volume and EBIT margin. Our mid-30s EBITDA margin for the full year demonstrates diligent cost control and full delivery of cost savings, which together helped mitigate unfavorable volume leverage from softer end markets***. Looking ahead, we will stay focused on the key strategies that have underpinned our financial performance, including aligning our spend to the market environment, investing ahead of recovery and evolving our plans to accelerate our market outperformance.

112. The statements referenced above in ¶¶110-111 were materially false and/or misleading for the same reasons described in ¶¶102-105. Touting the North America segment's prospects and fiscal 2025 results was misleading because customer demand and growth in the North America segment were deteriorating. It was misleading for Erter to tout North America

growth and outperformance, and for Wilson to state that James Hardie was able to achieve its FY25 guidance despite softer end markets, without also disclosing that overstocking James Hardie's distributors and dealers with inventory was the primary driver of the North America segment's financial results.

113. During the question-and-answer portion of the call, Keith Chau, from MST Financial Services, explicitly targeted information about industry destocking, asking:

> Aaron, just I want to talk about the channel at the moment. Quite clearly, the end market demand is soft. This selling season didn't transpire as expected. So just wondering ***if you can give us a sense of what you're seeing in the channel, how you're thinking about channel inventory levels and whether there is risk of destocking just going back to the experience in 2022***. ***So just seeing if you're seeing anything like that at the moment*** or whether you're happy with channel inventories at the moment?

114. In response, Defendant Erter expressly denied any such problems, stating:

> Yes. So look, I think as we look at the channel, and it's different for different customers, of course, but in general, ***I would say that we are seeing normal stock levels out there just as a general statement***.
>
> If we think about from a repair and remodel standpoint, and look, one of the things that is always one of my favorite things to do is be able to be out with our customers. So I was able to be with hundreds of them at IBS. I was able to be with many of them at our James Hardie events, whether that be at our Contractor Summit, our James Hardie Invitational, and more recently, just being out in the field with our contractors.
>
> So from a large homebuilder standpoint, I think you're seeing some of the press out there with different blips on the radar. But I think we're going to see a challenge from a large homebuilder standpoint as we look at single-family new construction. If we look at R&R, it continually is soft out there, and that's some of the comments that we talked about as we started this call.
>
> ***But as I said before, Keith, look, with that said, there's still a lot of share out there for us to be able to go out and get after.*** And I do believe we have the strongest value proposition. We're partnering with our dealer partners. We're partnering with our contractors. We're partnering with our large builders as we bring in differentiated solutions. And no matter what the environment, we're going to go out and win.

115. The statements referenced above in ¶114 were materially false and/or misleading for the same reasons described in ¶¶102-105. Erter confirmed that he had been monitoring channel inventory during the Class Period and admitted on August 19, "uncertainty built ***throughout April and early May***." James Hardie's customers "were managing their inventory" in April and "***we already started to see a little bit of that destock as you talk about April through May***." Despite being asked whether "you're seeing anything like that [inventory destocking] at the moment," Erter expressly denied the issue despite subsequently admitting that he did start to see inventory destocking in April and May, 2025. Plus, Mr. Chau was also the same MST analyst that asked about channel inventory in November 2022 and reminded Erter of the occasion to signify its importance to investors. Defendants knew investors would have been concerned that North America revenues were being driven by inflated channel inventory and not increased end-user demand, particularly if Defendants were seeing customer destocking.

116. On the same call, William Wilson, from UBS Investment Bank's Research Division, asked, "Just wanted to get a feel for how things have progressed this quarter in the U.S. that things kind of slowed down significantly March through to April but have started to pick up since. Is that what you're hearing on the ground?"

117. Defendant Wilson responded, "I think what we are saying is that we're being a little bit more conservative in the uncertainty in the markets right now. ***We are seeing performance in the month to date as we would expect. But look, we're going to be a little cautious out there. And our guidance is reflective of that. But again, we are performing very much to our plan***."

118. In response to a similar question about growth expectations, Defendant Erter responded in pertinent part: "Look, as you know, when you look at the history of our company,

***what we've been able to do is outperform no matter what the markets are. We've been proud of doing that. We'll continue to do that***."

119. The statements referenced above in ¶¶117-118 were materially false and/or misleading for the same reasons described in ¶¶102-105. Stating that James Hardie is "performing very much to our plan" and that it will "continue" to "outperform no matter what the markets are" was misleading because as Erter later stated on August 19, "uncertainty built throughout April and early May." James Hardie's customers "were managing their inventory" in April and "we already started to see a little bit of that destock as you talk about April through May." Defendants had been attuned to the risks of customer destocking in 2022 and had subsequently committed to increased "customer integration" of inventory data to prevent another customer destocking issue in the future. They were well aware of the importance of this issue to investors.

120. Brook Campbell-Crawford, from Barrenjoey Markets Research Division, asked, "The annual report notes that share gains in North America in FY '25 were positive but below target levels, which seems a little bit at odds with all the positivity you've talked about in the prepared remarks around share gains and wins… what led to that shortfall in share gains in '25 and how -- what you are going to do effectively to help change that going forward[?]" In response, Erter stated:

> Yes. Brook, just really simply, and I think ***we mentioned this before, our single-family exteriors business, right, which is the bulk of our business grew in what was a down market, so we are outperforming. And I think Keith just asked the question, I gave a little bit of clarity there.*** Where we did see some slippage was in multifamily, which that whole category was down dramatically. And then if you look at our interiors business, it was down, call it, high single digits as well. And the interiors business really correlates to large interior remodeling projects.

121. Defendant Wilson then added, in response to the same question:

> I think it's also important to add, as Aaron was talking about, with some of those wins that you've been experiencing and what are you expecting and I think what we should talk about is that ***we do expect strategic acceleration, and that's***

> ***reflective of that progress we're making with new construction, where we've announced those wins but those volumes ramp up throughout the year***.
>
> We've had momentum that we are building with our contractor and R&R, and that's the result of some of that ColorPlus, which demonstrates the progress even in softer markets. And we've had contribution from new product releases like TimberHue. ***Again, as Aaron talked about, we expect those to build throughout the year.*** We've had innovations to improve on-the-wall costs, as Aaron discussed, yielding encouraging early results. So I think those are some of those strategic initiatives as we look ahead and think about volumes for next year.

122. The statements referenced above in ¶¶120-121 were materially false and/or misleading for the same reasons described in ¶¶102-105. Erter's statements that James Hardie was "outperforming" in a "down market" were misleading because Defendants were seeing "uncertainty built throughout April and early May." James Hardie's customers "were managing their inventory" in April and "we already started to see a little bit of that destock as you talk about April through May." Wilson's statements affirming outperformance and priming investors to expect "strategic acceleration" were likewise misleading. Defendants had been attuned to the risks of customer destocking in 2022 and had subsequently committed to increased "customer integration" of inventory data to prevent another customer destocking issue in the future.

123. Also on May 20, 2025, James Hardie filed its Form 20-F with the SEC, which was signed by Defendants Erter and Wilson. The 2025 20-F contained materially false and misleading statements about the Company's financial performance.

124. In the 2025 20-F, Defendants represented that for the North America segment, "Organic Revenue Growth" was "12.2%" and "EBIT Margin" was "29.6%," both for fiscal years 2023-2025, and the results "***exceeds expectations***." Defendants also stated that net sales in North America Fiber Cement were "2,863.3 million" for fiscal 2025.

125. The statements referenced above in ¶124 were materially false and/or misleading for the same reasons described in ¶¶102-105. It was misleading to state that organic revenue

growth and EBIT margin were exceeding expectations because as FE 1 detailed, the North American team would pull in sales at the end of each quarter in response to pressure from Erter. pulling in sales to meet financial goals because Erter was preparing for upcoming earnings calls. Unbeknownst to investors, and as explained by FE 2, James Hardie's distributors and dealers were overstocked with inventory and demand declines were threatening future sales.

### B. May 21, 2025 Earnings Release

126. James Hardie's earnings release, dated May 21, 2025 and filed with the SEC on Form 6-K on May 20, 2025, similarly touted outperformance despite adverse market conditions, with James Hardie stating:

> In North America, the Company is ***outperforming its end markets through a superior value proposition and driving leading margins despite raw material headwinds. James Hardie's significant material conversion opportunity and investments across the North American manufacturing footprint have positioned the Company well to capitalize as the market returns to growth and the long-term housing fundamentals play through.*** The Company is investing across the value chain and growing its contractor base to capture the repair & remodel opportunity. Similarly, in new construction, efforts to deepen exclusivity and increase trim attachment rates support growth and share gain with large homebuilders.

127. The release also quoted Defendant Erter as stating:

> Over the past five years, our North American business has grown the top line at a +10% CAGR and expanded Adjusted EBITDA margin by more than +400bps, ***a clear demonstration of the inherent strength of our value proposition and the underlying momentum in our strategy. Our conviction is as strong as ever in achieving our long-term aspirations for North America Fiber Cement, namely to grow revenue double-digits, expand EBITDA margins by another +500 basis points, and triple our EBITDA***. I am confident in the future of James Hardie as we continue building on these successes and accelerate our growth strategy.

128. The statements referenced above in ¶¶126-127 were materially false and/or misleading for the same reasons described in ¶¶102-105 and ¶119. Stating that the North America segment was "outperforming" and that "***[o]ur conviction is as strong as ever in achieving our long-term aspirations for North America Fiber Cement***, namely to grow revenue double-digits,

expand EBITDA margins by another +500 basis points, and triple our EBITDA" was misleading because as Erter later stated on August 19, "uncertainty built throughout April and early May." James Hardie's customers "were managing their inventory" in April and "we already started to see a little bit of that destock as you talk about April through May." Investors did not have the full picture, despite analysts repeatedly asking about the North America channel since November 2022.

129. Speaking on James Hardie's market outlook, Defendant Erter stated:

> More recent, broader macroeconomic uncertainty could further impact the cost of home construction and weigh on consumer sentiment, influencing demand. As a result, in North America, which represents approximately three-quarters of our total net sales we are prudently planning for market volumes to contract in FY26, including a fourth consecutive year of declines in large-ticket repair & remodel activity. ***Despite these near-term headwinds, our brand and the attractiveness of our value proposition to customers has and will enable James Hardie to structurally grow through expansions and contractions. We will continue to navigate through the current backdrop, focusing on outperforming our end-markets to drive top- and bottom-line in FY26, consistent with our prior planning assumptions.***

130. The statements referenced above in ¶129 were materially false and/or misleading for the same reasons described in ¶¶102-105. Stating that despite "near-term headwinds," James Hardie was poised to focus "on outperforming our end-markets to drive top- and bottom-line in FY26, consistent with our prior planning assumptions" was false and misleading because Defendants "already start[ing] to see a little bit of that destock as you talk about April through May."

131. The release also quoted Defendant Wilson as stating:

> ***We achieved each of our FY25 guidance metrics despite a more challenging macro environment as compared to May of last year, when we initially provided this outlook. In North America, our team delivered a solid fourth quarter and we achieved our guidance points, both in our second half and full year, for volume and EBIT Margin. Our mid-thirties EBITDA margin for the full year demonstrates diligent cost control and full delivery of HOS savings, which together, helped mitigate unfavorable volume leverage from softer end markets.***

132. The statements referenced above in ¶131 were materially false and/or misleading for the same reasons described in ¶¶102-105 and ¶112. Touting the North America segment's fiscal 2025 results was misleading because customer demand and growth in the North America segment were deteriorating. It was misleading to state that James Hardie was able to achieve its FY25 guidance despite softer end markets without also disclosing that overstocking James Hardie's distributors and dealers with inventory was the primary driver of the North America segment's financial results.

## VII. THE TRUTH EMERGES

133. The truth about Defendants' misrepresentations was finally revealed on August 19, 2025, when James Hardie reported that North America Fiber Cement sales declined by 12%, Q1 2026 profit declined by 29%, and projected lower-than-expected fiscal 2026 earnings. James Hardie admitted that its disappointing results largely reflect "***expected normalization of channel inventories*** due to moderating growth expectations by our customers ***as uncertainty built throughout April and early May***." Defendant Erter also indicated that this "normalization" would continue, stating, "we believe it is prudent to plan for more cautious order patterns and ***defensive inventory positioning*** at our channel partners, exacerbated by the slower seasonality of new construction ***into the back half of the calendar year***."

134. While Erter claimed that he previously "talked about inventory being relatively normalized" on the May 20, 2025 conference call, James Hardie had projected that North America net sales growth would be "up low single-digits," and an analyst from MST Financial Services challenged the implication that issue had been disclosed, stating, "So you mentioned we spoke about it at the last quarter, which we certainly did and that was 7.5 weeks into the quarter. So the

destocking into the second half of the quarter must have been quite severe." In response, Erter provided more detail on the inventory destocking timeline, stating:

> Let me give you a little bit of a time line when we think about inventory here. We talked -- just talked about it, but I'll reiterate it again. ***So Q4 FY '25 in March, we sold our customers prepared for growth. right? You think about the time, the election ended up happening in November, people were ready for growth.*** Look, and we talked about inventory not too high, but full well positioned for growth in the building season out there. As we got into April, we cited this on the call, a little bit of noise, a little bit of uncertainty. You get into May, we have our call, June environment softening. As we got into April, people were managing their inventory, right? ***So we already started to see a little bit of that destock as you talk about April through May.*** And then look, as we got into July, June, it was softening and then as we got into July, we really saw customers getting into defensive inventory posture.

135. Thus, despite starting to see the destock in April and early May, Defendants made numerous statements on May 20 and 21, 2025 falsely assuring investors that the North America segment remained strong despite the challenging market environment and denying that inventory destocking would be an issue.

136. On this news, James Hardie's common stock price fell by $9.79, or 34.44%, to close at $18.64 on August 20, 2025.

137. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VIII. POST-CLASS PERIOD DEVELOPMENTS

138. As of December 2025, the Company changed its segment reporting structure to conceal its legacy North America business within AZEK as originally planned. Under its revised reporting structure, North America Fiber Cement segment was integrated with the acquired AZEK North America Exteriors business to form a new segment called Siding & Trim. Additionally, the Company created a Deck, Rail & Accessories segment which includes the remainder of AZEK's

North America "outdoor living" business. The legacy Asia Pacific Fiber Cement segment was renamed the Australia & New Zealand segment, and the legacy Europe Building Products segment was renamed the Europe segment.

139. The Siding & Trim segment remains the Company's largest source of revenue, but investors no longer receive a full breakdown of the performance of its legacy fiber cement business in comparison to its new AZEK business.

140. In addition, Defendant Wilson "stepped down" as CFO of the Company on November 17, 2025, and was replaced by Ryan Lada, the former CFO of AZEK.

141. On February 10, 2026, James Hardie held an earnings call for Q3 2026 quarterly results where Erter and Lada both stated that channel inventories remain elevated. On the call, Erter reminded investors that, "one of the things I think that you'll remember is ***we are facing a comp from an inventory build that we saw in Q4 last year***." In response to an analyst's question about "near term" expectations, Erter responded in relevant part:

> So what we're seeing in Texas is builders, for the most part, ***have been tightly managing inventory. After significant volume declines in Q3, we have seen some signs of normalization early in the calendar year.*** The recent weather has created short-term production delays, and we're seeing most builders remain conservative, pacing starts to sales.
>
> If I look in the Southeast, I look at the Carolinas, demand remains soft there when Q3 volumes down year-over-year. ***Inventory in key markets like Orlando, Jacksonville, Tampa and Atlanta remain elevated***. The Carolinas and Tennessee continue to benefit from strong migration trends, and we're seeing healthier starts there.
>
> In the West, starts are slow. ***Builders across the Southwest and Mountain states, they're overbuilt in inventory right now.*** The Midwest activity is comparatively resilient. We're seeing areas like Minneapolis. We're seeing Chicago, Ohio, Pittsburgh due to more affordable price points, and we're seeing strong performance in the higher-priced bands as well. ***Some easing in contractor backlog is creating momentum as the season progresses.***
>
> ***So look, overall, in new construction, it's soft across many of the key regions. Inventory levels are elevated.*** But the good news is consumer sentiment has

> stabilized, and it's supported by pent-up demand, and we're seeing modest relief in mortgage rates.
>
> As we move to repair and remodel, we would say that, that is stabilizing. ***It's choppy, but it's stabilizing. We're not seeing it getting any worse, which is good.*** We're seeing sentiment improving across all our regions, West, South, Midwest and Northeast, particularly where there's aging housing stock, which makes a lot of sense. And if we look at our contractor surveys that we brought in this best practice from AZEK, we are seeing some optimism in -- with our contractors.
>
> ***So all in all, I would say, new construction continues to be a challenge but not unexpected from what we talked about a little bit in November. And then if we look at repair and remodel, we would say stabilizing***.

142. In response to a question from Peter Steyn, an analyst at Macquarie Research, about reducing volatility in inventory, Lada responded:

> Yes. Yes. I would say, as you think about the commercial synergies we're going after, there is a little bit of build on our internal balance sheet to be able to satisfy those as those come to fruition. So I think we hit a little bit on the prior question, but there is phasing and timing of rollout into the season***. So we would expect as that normalizes, our inventory and our balance sheet would also come down.*** But yes, the real build is driven by that, nothing else intentionally.

143. Steyn then followed up asking, "would there be network redesign benefits that flow over the medium term as well?" to which Lada responded: "Yes, nothing major contemplated in that. I think with the optimization of our footprint here that was announced last month, ***it's really a rebalance of the inventory through that*** and the corresponding freight to fulfill the customer demand."

## IX. ADDITIONAL SCIENTER ALLEGATIONS

144. As alleged herein, Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions

intended to inflate the market price of James Hardie's common stock. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding James Hardie, their control over, and/or receipt or modification of, James Hardie's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning James Hardie, participated in the fraudulent conduct alleged herein. Indeed, the fraudulent conduct described herein could not have been perpetuated without the knowledge and complicity, or at minimum reckless disregard, of the personnel at the highest level of the Company, including the Individual Defendants.

### A. Erter and Wilson Had Massive Financial Incentives to Inflate North America Performance

145. Erter and Wilson were motivated to misrepresent James Hardie's financial results because of the large cash bonuses and stock option grants that were closely tied to the Company's financial performance, including North America revenue and sales.

146. According to James Hardie's 2025 20-F, its compensation practices for executives are a "Pay for performance model, with approximately **87%** of our CEO's total target compensation being performance-based 'at risk' compensation and an average of approximately **67%** total target compensation being performance-based 'at risk' compensation for our other Senior Executive Officers." Specifically, executive compensation was tied to the Company hitting target organic revenue growth and EBIT margin, in addition to other metrics. James Hardie also explained that it had a "Circuit breaker on annual STI awards ***to ensure that no annual incentive awards are paid unless minimum North America growth and corporate performance levels are achieved***."

147. Due to the sales pull forwards detailed herein, James Hardie's organic revenue growth, EBIT margin, and high value product mix, among other metrics, were materially

overstated during the Class Period, allowing Erter and Wilson to receive exorbitant additional compensation. Incentive programs, including both a short-term incentives ("STI") and long-term incentives ("LTI") raised Erter's target compensation for fiscal 2025 significantly, from a base salary of $1,090,000 to a total compensation amount of $8,607,000. The incentive awards also more than tripled Wilson's total compensation, from a base salary of $644,800 to a total compensation amount of $2,228,400.

148. Specifically, for fiscal 2025, Erter's STI target value was $1,417,000 and LTI target value was $6,100,000. Wilson's STI target value was $483,600 and LTI target value was $1,100,000. Both STIs would be paid fully in cash, while the LTIs would be paid half in cash, half in RSUs. Thus, Erter was poised to collect an additional $4,467,00 in performance-based cash payments, and Wilson was poised to collect an additional $1,033,600 in performance-based cash payments, both far exceeding their base salaries.

149. Had Erter not required sales representatives to continually pull sales from subsequent quarters into then-current quarters, Erter and Wilson would not have received this level of compensation. Because Erter and Wilson's compensation was tied to the Company's financial performance, they were motivated to inflate key financial figures to obtain additional incentive compensation.

**B. James Hardie Closely Monitored Channel Inventory Levels and Erter Admitted They Started to See Destocking in April 2025**

150. Defendants admitted that they employed "customer integration" to track North America inventory levels, with Wilson stating in August 2023 that "we're specifically getting a tighter look on their inventory with our top customers" to "efficiently manage their inventory" and Erter adding that "the data in which they're giving us, which is helping us as it relates to helping them, right, to have the right inventory and where they need it." This was in direct response to an

issue disclosed in November 2022 where North America customers asked to "partner[] with [James Hardie] to lower their inventory levels."

151. That Defendants had the ability to track North America channel inventory, and specifically commented on channel inventory levels, expressly denying any concerns during the Class Period, indicated their clear understanding of the issue. This is further evidenced by Defendants' disclosures on August 19, 2025 that Defendants knew of customer destocking "in April through May" and subsequently admitted that channel levels now needed to "normalize." Erter also admitted after the Class Period that "inventory levels are elevated" in many of James Hardie's "key regions."

152. The FEs also detailed how Defendants monitored sales and inventory levels. FE 1 described how Erter would send emails to the North America team pressuring them to meet their sales targets, and that the North America leadership team would discuss how to meet Erter's expectations at meetings every other week. FE 3 stated that James Hardie controlled the inventory the distributors had for each SKU, which included replenishing distributor inventories. FE 4 stated that James Hardie's inventory data included inventory turnover, which was discussed on internal calls that occurred regularly on a monthly and quarterly basis. FE 2 explained that James Hardie employed a VMI system for large distributors to store James Hardie inventory, and FEs 1 and 3 also described James Hardie's VMI.

153. James Hardie's channel inventory levels were also a hot topic of interest with third party analysts following the Company. On May 20, 2025, Mr. Chau from MST explicitly asked Erter "how you're thinking about channel inventory levels and ***whether there is risk of destocking just going back to the experience in 2022*** " and " ***if you're seeing anything like that at the moment."*** In response, Erter demonstrated knowledge of channel inventory levels by stating "that

***we are seeing normal stock levels out there*** just as a general statement." Prior to the May 20 earnings call, analysts repeatedly asked about the channel.

154. For example, on the November 2022 call, in response to Erter's disclosure that customers were asking to lower inventory levels, Mr. Chau asked in response whether the "dealer distributor channel" had an "element of destocking" that would impact volumes. In the next earnings call, on February 13, 2023, numerous analysts asked follow-up questions, including Lee Power from UBS, asking, "Can you just talk a little bit about inventory levels in the channel, like where do you think they sit now? And particularly, just thoughts around risk of further destocking given your kind of your outlook commentary?"

155. Facing consistent questions from analysts about the Company's channel inventory, Defendants went to great lengths to assure the market that channel inventory levels had normalized. Because Defendants did not publicly report channel inventory levels, analysts had to take Defendants at their word. Once the truth about James Hardie's North America channel inventory was revealed, however, analysts were shocked and commented that James Hardie was "clear as mud." The Company's channel inventory did not become massively elevated overnight, but had grown to unsustainable heights by repeatedly overloading distributors and dealers, as detailed by FE 1.

156. Defendants' scienter is also supported by their post-Class Period admissions, as Erter admitted on August 19 that reduced demand indeed was the driving force behind customer destocking, stating, "demand in both repair and remodel and new construction in North America are challenging" and "first quarter results…reflect an expected normalization of channel inventories due to moderating growth expectations by our customers as uncertainty built throughout April and early May."

**C. Both Jason Miele and Defendant Wilson "Stepped Down" From Their Positions as CFO After Disclosing Channel Destocking Issues**

157. After Erter revealed in November 2022 that customers were asking to lower inventory levels, contributing to a significant guidance reduction for North America, and described "significant channel destocking" in February 2023, James Hardie's prior CFO at the time, Jason Miele, "stepped down" only a few months later, in August 2023. In his last earnings call as CFO on August 8, 2023, Miele stated that channel inventories were "starting to see some normalization" but indicated that the issue was not fully resolved. Shortly thereafter, he "stepped down" as CFO amidst the disappointment from investors about the channel.

158. Similarly, Defendant Wilson "stepped down" from her role as CFO on November 17, 2025, only two months after Defendants' fraud was revealed. On the same date, Ryan Lada was appointed as James Hardie's new CFO, effective immediately.

159. The departures of two different CFOs, both only months after disclosing significant customer destocking, strengthens the inference of scienter. Both Miele and Wilson were the Company's senior-most financial officers and were directly connected to monitoring and reporting on the Company's revenue and sales.

**D. James Hardie's North America Channel Was Too Big to Ignore**

160. Defendants' misstatements centered on James Hardie's core business and largest source of revenue by far. James Hardie's North America segment comprised about 80% of the Company's revenue and a significant portion of Erter's and Wilson's compensation came from the performance of the North America segment. The importance of fiber cement was further compounded by the Company's ongoing transition into "outdoor living" as a result of the costly AZEK acquisition, with fiber cement representing a stable, lucrative, and recurring revenue stream. Given the importance of the Company's fiber cement revenue to James Hardie's overall

operations and financial performance, it is reasonable to infer that Defendants were well aware of the performance of one of the Company's key revenue drivers.

161. James Hardie was also focused on becoming an American company, with its primary listing changing from Australia to the NYSE. It was focused on building out its North America segment with AZEK, and the segment's performance would have informed acquisition discussions with AZEK personnel about potential synergies only months prior. For example, James Hardie's Form F-4, filed on May 5, 2025, detailed lengthy discussions between Erter and AZEK leadership about their respective businesses. In particular, on January 27, 2025, representatives of AZEK and James Hardie senior management teams, with their respective third-party consultants who had been retained to assist in assessing potential synergies and financial advisors, met in person and "made presentations during which they provided certain financial, operational and legal information, including with respect to long-term strategic plans and historical and projected financial performance." Over the course of the next few weeks, both management teams "continued to provide each other with financial and business due diligence information in order to evaluate potential synergies and financials for the combined company." Thus, Defendants were particularly focused on the North America segment's business only a few months before making the misstatements detailed herein.

162. In addition, James Hardie's Financial Statements Disclosure Committee, a management committee comprised of senior finance, accounting, compliance, legal, tax, treasury and investor relations executives, meet prior to the Board's consideration of any quarterly or annual results. This meeting "is part of the Quarterly Compliance meeting," as stated in the 2025 20-F, and "is a forum for the CEO, CFO and Chief Legal Officer to discuss, and, on the basis of those discussions, report to the Audit Committee, about a range of risk management procedures,

policies and controls, covering the draft results materials, ***business unit financial performance*** and the current status of legal, tax, treasury, accounting, compliance, internal audit, complaints and disclosure control matters." (emphasis added). As James Hardie's largest business unit by far, these Quarterly Compliance meetings, attended by both Erter and Wilson, would necessarily have involved a discussion of the North America segment's performance.

163. Because James Hardie does not have a risk management committee at the Board level, the Audit Committee is responsible for oversight of the Company's risk management strategy, policies, procedures and controls. As stated in the 2025 20-F, the Audit Committee "reviews, monitors and discusses these matters with the CEO, CFO, Chief Legal Officer, Vice President of Internal Audit and other senior business leaders" and the "Audit Committee, CEO, CFO and Chief Legal Officer report periodically to the Board on the Company's risk management policies, processes and controls." During fiscal year 2025, management "assessed the effectiveness of the Company's internal controls over financial reporting" and deemed them effective.

164. Erter was also expressly "responsible for ensuring the Company complies with its continuous disclosure obligations. Senior management, including both Erter and Wilson, "is responsible for all decisions regarding market disclosure obligations outside of the Company's normal financial reporting calendar." Thus, both Erter and Wilson were responsible for continuously assessing whether James Hardie had additional disclosure obligations beyond its normal fiscal calendar. This involves remaining apprised of material developments in the Company's core business.

165. These facts collectively support a strong inference that Defendants knowingly made materially false and misleading statements and omissions, or acted recklessly in doing so, during the Class Period.

## X. LOSS CAUSATION/ECONOMIC LOSS

166. As detailed herein, Defendants' materially false and misleading statements and omissions of material facts maintained artificial inflation in the Company's stock price by misrepresenting and concealing the true nature of the Company's North America business, in particular, the fact that James Hardie's channel inventory levels had risen to abnormally high and unsustainable levels. Defendants' false and misleading statements and omissions concealed that James Hardie had been selling fiber products to distributors and dealers in excess of demand as they stocked up on in response to discounts and anticipated price increases.

167. As a result, the Company's stock was artificially inflated until, as indicated herein, the relevant truth about James Hardie's channel and softening demand was revealed after the close of trading on August 19, 2025. While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and give the market the false notion that James Hardie's channel inventory levels were not elevated and end-user demand for fiber products was not softening thus putting at risk the Company's revenues and financial outlook. Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $29.66 during the Class Period, on August 13, 2025.

168. The truth emerged on August 19, 2025, when after the close of trading, James Hardie disclosed that sales in North America Fiber Cement declined by 12% due to the customer destocking first discovered by Defendants "in April through May." Defendant Erter revealed that "normalization of channel inventories" was expected to impact sales for the next two quarters.

169. As a result of the information revealed to the market, the price of price of James Hardie's common stock dropped by over 34%, or $9.79 per share, from a closing price of $28.43 per share on August 19, 2025 to $18.64 per share on August 20, 2025. The decline in James Hardie's stock price is directly attributable to the announcement of inventory overstocking in the North America segment, and the associated sales decline and disappointing 1Q 2026 results.

170. The timing and magnitude of the Company's stock price decline on August 20, 2025 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

171. In sum, the rapid decline in the Company's stock price on August 20, 2025 was the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market. Thus, the revelations of truth as well as the resulting clear market reaction support a reasonable inference that the market understood Defendants' prior statements were false and misleading. In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

172. Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff on August 20 2025, were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

173. At all relevant times, the markets for James Hardie stock were efficient for the following reasons, among others:

a) James Hardie common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

b) As a regulated issuer, James Hardie filed periodic public reports with the SEC;

c) James Hardie regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) James Hardie was followed by numerous securities analysts employed by major brokerage firms, including Goldman Sachs, Jefferies, JP Morgan, Morgan Stanley, Truist Securities, RBC Capital Markets, William Blair, and UBS, among others, who wrote reports which were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

174. As a result of the foregoing, the market for James Hardie stock promptly digested current information regarding James Hardie from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of James Hardie stock during the Class Period suffered similar injury through their purchase of James Hardie stock

at artificially inflated prices, and a presumption of reliance established by the fraud-on-the-market doctrine applies.

175. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material, adverse information regarding James Hardie's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

176. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made or to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

177. Alternatively, to the extent that the statutory safe harbor applies to any forward looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward looking statement was authorized and/or approved by an executive officer of James Hardie who knew that the statement was false when made. Moreover, to the extent that Defendants issued

any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XIII. CLASS ACTION ALLEGATIONS

178. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired James Hardie common stock between May 20, 2025 through August 19, 2025, inclusive, including those AZEK shareholders who received James Hardie common stock in exchange for their AZEK common stock on or around July 1, 2025. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

179. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, James Hardie stock was actively traded on the NYSE. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at least in the thousands and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by James Hardie or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

180. Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

181. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

182. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

183. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) Whether Defendants' publicly disseminated statements during the Class Period omitted and/or misrepresented material facts;

c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d) Whether Defendants acted knowingly or with recklessness in omitting and/or misrepresenting material facts;

e) Whether the price of James Hardie stock during the Class Period was artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

f) The extent of damage sustained by members of the Class and the appropriate measure of damages.

184. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

185. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186. During the Class Period, Defendants disseminated, approved or made the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

188. James Hardie and the Individual Defendants, individually and together, directly or indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about James Hardie's business and operations as specified herein.

189. James Hardie and the Individual Defendants had actual knowledge of the misrepresentations and/or omitted material facts set forth herein, or recklessly disregarded the misleading and/or omitted material facts that were available to them.

190. As a result of the dissemination of the misleading information and failure to disclose material facts, as set forth above, the market price of James Hardie common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of James Hardi common stock was artificially inflated, Plaintiff and other members of the Class purchased or otherwise acquired James Hardie common stock during the Class Period at artificially high prices and were damaged thereby.

191. Plaintiff and the Class paid artificially inflated prices for James Hardie common stock, and suffered losses when the relevant facts were revealed. Plaintiff and the Class would not have purchased or otherwise acquired James Hardie common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

192. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their Class Period transactions in James Hardie common stock.

193. By reason of such conduct, Defendants are liable pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

194. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

195. The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

196. In particular, each of the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company, and therefore, are presumed to have had the power to control or influence the particular business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

197. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of James Hardie common stock during the Class Period when the relevant truth was revealed.

198. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: April 20, 2026

Respectfully submitted,

*/s/ Katrina Carroll*
Katrina Carroll
**CARROLL SHAMBERG LLC**
200 N. LaSalle Street, Suite 1650
Chicago, IL 60601
(872) 215-6205 phone
katrina@csclassactions.com

*Local Counsel for Plaintiff and Liaison Counsel for the Class*

Jeffrey C. Block
Jacob A. Walker
Sarah E. Delaney
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
jake@blockleviton.com

sarah@blockleviton.com

*Lead Counsel for Oklahoma Firefighters Pension and Retirement System and the Class*